

# PALOS VERDES ESTATES POLICE DEPARTMENT

Officer Report for Incident 22-15892

---

| | | | |
|---|---|---|---|
| **Nature:** UNWANTED GUEST | | **Address:** 1501 VIA ASTURIAS | |
| **Location:** PVEP | | PLS VRD EST CA 90274 | |

---

**Offense Codes:** 13A, ELD1

| | | |
|---|---|---|
| **Received By:** C. Lau | **How Received:** T | **Agency:** PVEP |
| **Responding Officers:** J. Ix, J. Zabukovec, S. Lebeau, K. Ackert | | |
| **Responsible Officer:** J. Ix | **Disposition:** AAC 08/27/22 | |
| **When Reported:** 20:16:08 08/26/22 | **Occurred Between:** 18:30:00 08/26/22 and 20:40:00 08/26/22 | |

---

| | | |
|---|---|---|
| **Assigned To:** S. Crisfield | **Detail:** | **Date Assigned:** **/**/** |
| **Status:** DA | **Status Date:** 08/29/22 | **Due Date:** **/**/** |

---

**Complainant:** ▮

| | | |
|---|---|---|
| **Last:** BAUMGARTNER | **First:** DEBRA | **Mid:** |
| **DOB:** ▮ | **Dr Lic:** ▮ | **Address:** 1501 VIA ASTURIAS |
| **Race:** ▮  **Sex:** ▮ | **Phone:** ▮ | **City:** PLS VRD EST, CA 90274 |

## Offense Codes

| | | |
|---|---|---|
| **Reported:** CASS Citizen Assist | | **Observed:** |
| **Additional Offense:** 13A AGGRAVATED ASSAULT | | |
| **Additional Offense:** ELD1 368 Elder Abuse | | |

## Circumstances

LT20 Residence or Home

**Responding Officers:**           **Unit :**

| Officer | Unit |
|---|---|
| J. Ix | 7A21 |
| J. Zabukovec | 7A21 |
| S. Lebeau | 7S2 |
| K. Ackert | 7L22 |

| | |
|---|---|
| **Responsible Officer:** J. Ix | **Agency:** PVEP |
| **Received By:** C. Lau | **Last Radio Log:** 21:48:57 08/26/22 CMPLT |
| **How Received:** T Telephone | **Clearance:** DTF Detectives to File at Court |
| **When Reported:** 20:16:08 08/26/22 | **Disposition:** AAC **Date:** 08/27/22 |
| **Judicial Status:** DONE | **Occurred between:** 18:30:00 08/26/22 |

04/25/23

**Misc Entry:** LEBEAU    **and:** 20:40:00 08/26/22

**Modus Operandi:**    **Description :**    **Method :**

## Involvements

| Date | Type | Description | Relationship |
|------|------|-------------|--------------|
| 08/26/22 | Name | GRALOW, CHRISTINE MARY | Offender |

## Narrative

Palos Verdes Estates Police Department
Investigative Narrative

On Friday, 08/26/2022, at approximately 2016 hours, I (Officer Ix #749)
and Officer Zabukovec (#762) were working uniformed patrol in a black and white
patrol vehicle (#722) when we were dispatched to 1501 Via Asturias for an
unwanted guest call. The reporting party (RP), Debra Baumgartner (55-Yrs Old /
DOB: 02-06-67), stated her cousin (S-1/ Christine Gralow (48-Yrs Old / DOB:
01-21-74) unexpectedly arrived at the residence (1501 Via Asturias)
intoxicated and was being physical. S-1/ Christine Gralow was currently located
outside of the residence and was arguing with her own mother, Ruth Gralow
(86-Yrs Old / DOB: 04-21-36).

Upon our arrival, we observed S-1/ Christine Gralow and her mother, Ruth Gralow
(Ruth), in the driveway of 1501 Via Asturias. After we separated the mother and
daughter, I asked S-1/ Christine Gralow to have a seat on the nearby curb, to
which she complied. RP/Baumgartner and Ruth went back into the residence, after
I advised them an officer would speak with them inside.

While seated at the curb, S-1/ Christine Gralow told me that Ruth is her mother
and Ruth's sister (V-1/ Mary Baumgartner / 89-Yrs Old / DOB: 12-06-32) lives /
owns the residence at 1501 Via Asturias. S-1/ Christine Gralow's cousin
(RP/Baumgartner) is currently living at 1501 Via Asturias for the purpose of
caring for her elderly mother (V-1/ Mary Baumgartner).

Upon the arrival of Sergeant LeBeau (#724) and Sergeant Ackert (#725), I entered
the residence and spoke with RP/Baumgartner, who advised me of the following:
RP/Baumgartner currently lives at 1501 Via Asturias to help provide care for her
mother, V-1/ Mary Baumgartner.

V-1/ Mary Baumgartner suffered a stroke approximately six weeks earlier and as a
result, she is now in the care of hospice. Prior to her stroke, V-1/ Mary
Baumgartner was able to care for her own well being; however, she did have
early onset dementia. After V-1/ Mary Baumgartner's stroke, she became entirely
bedridden in the lower level bedroom of the residence. V-1/ Mary Baumgartner has
zero short term memory and is unable to recall any recent events.  V-1/ Mary
Baumgartner is unable to communicate with others, even with the use of
Augmentative and Alternative Communication Tools (AAC). V-1/ Mary Baumgartner's
survival is dependant on the use of supplemental oxygen, which is required
twenty-four (24) hours a day. V-1/ Mary Baumgartner's supplemental oxygen is
received via nasal cannula, which is a small / thin tube with prongs on the
ends that sit inside each of her nostrils to constantly deliver her required
oxygen (see photos).

Additionally, V-1/ Mary Baumgartner's current medical condition requires her to
have a full time caregiver for the purpose of tending to all of her needs.
Witness (W-1)/ Ellyza Baidiango (DOB: 08-21-2003) has been V-1/ Mary
Baumgartner's caretaker for approximately the past five (5) weeks. W-1/Baidiango
lives at 1501 Via Asturias from Thursday through Sunday, each and every week.
RP/Baumgartner provides the required care for her mother (V-1/ Mary
Baumgartner) during the three days that W-1/Baidiango is not at the residence.

RP/Baumgartner advised me that at the time of this incident, W-1/ Baidiango was
caring for V-1/ Mary Baumgartner and she is the person who witnessed it take
place. RP/Baumgartner was not at the residence when this incident occurred;
however, after receiving a telephone call from W-1/ Baidiango, she immediately

came back. During their telephone call, W-1/ Baidiango did not provide her with details and only stated her assistance was immediately required. Shortly after receiving the telephone call, RP/Baumgartner came back to the residence.

After receiving the above information, I spoke with W-1/ Baidiango and the following is a summary of her statement: On 08/26/22, at approximately 1830 hours, Ruth Gralow arrived at the residence for the purpose of visiting with her sister (V-1/Mary Baumgartner), which was normally done every day. During Ruth's visits, she normally sits with her sister (V-1), while singing her favorite songs.

After entering the residence, Ruth walked downstairs to her sister's bedroom, which was located on the lower floor. After several minutes, Ruth walked back upstairs and returned to the main level floor. Ruth then advised  W-1/ Baidiango that she was concerned for her daughter (S-1/ Christine Gralow) and exited the residence via the front door.

Shortly thereafter,  W-1/ Baidiango heard an extremely loud banging on the front door. After several seconds of banging,  W-1/ Baidiango opened the front door and immediately observed S-1/ Christine Gralow standing outside. S-1/ Christine Gralow then, uninvited entered the residence and a short verbal argument between S-1/ Christine Gralow and W-1/ Baidiango ensued. During the short verbal argument, Ruth re-entered the residence and W-1/ Baidiango then walked downstairs so that she could check on V-1/Mary Baumgartner's welfare.

Moments later, while W-1/ Baidiango was still downstairs, she heard the sound of an unknown loud bang that came from the main level of the residence, where Ruth and S-1/ Christine Gralow had just been located. S-1/ Christine Gralow then walked downstairs to the lower level and advised W-1/ Baidiango that her mother (Ruth) had just hit her. It should be noted that neither of the two subject stated they were struck by the other, and there were no visible injuries observed or claimed by either Ruth or by S-1/ Christine Gralow.

Due to the above, along with S-1/ Christine Gralow's behavior, W-1/ Baidiango walked back upstairs so that she could check on Ruth's welfare. During this time, S-1/ Christine Gralow was left alone in the lower level master bedroom with her Aunt (V-1/ Mary Baumgartner). A few seconds later, while still located on the lower level, S-1/ Christine Gralow shouted to her mother (Ruth) upstairs and stated, "Don't go downstairs with your sister, let her go."  S-1/ Christine Gralow then shouted to her mother a second time, again advising her not to come into the bedroom and that she (Ruth) was being selfish.

W-1/ Baidiango said during this time, she walked back downstairs and was standing in the hallway, where she had a clear / unobstructed view of the master bedroom, V-1/Mary Baumgartner, and S-1/ Christine Gralow when the following events occurred.

It should be noted that after obtaining W-1/ Baidiango's statement, I asked her to stand in the exact location where she was standing as she witnessed the following events occur, to which she did. I then stood in the exact location where W-1/ Baidiango was standing and then asked her if V-1/ Mary Baumgartner's current location was exactly the same during the time when she witnessed the following events occur, to which she stated it was.

While standing in the exact location of where W-1/ Baidiango was standing when she witnessed the following events occur, I had a clear and unobstructed view of V-1/ Mary Baumgartner, who was located in the exact spot when the below following events occurred. I also had a clear and unobstructed view of several

feet in each direction surrounding V-1/ Mary Baumgartner. When W-1/ Baidiango
witnessed the following events take place, the distance between W-1/ Baidiango
and V-1/ Mary Baumgartner was approximately twenty (20) feet (see photographs).

W-1/ Baidiango went on to tell me that as she was standing in the hallway (above
location), she observed S-1/ Christine Gralow standing a couple of inches to the
left of RP/Baumgartner (V-1's right side), between her bed and the fireplace.
While standing there, S-1/ Christine Gralow was holding a framed photograph of
V-1/ Mary Baumgartner's deceased husband. It should be noted there were five
framed photographs located on the fireplace hearth. When asked, RP/Baumgartner
pointed out the only photograph of V-1/ Mary Baumgartner's husband that was
located in the area (see attached), to which W-1/ Baidiango  confirmed it was in
fact what S-1/ Christine Gralow was holding.

W-1/ Baidiango then heard S-1/ Christine Gralow say, "You don't want it
in, I'll pull it out", while looking directly at V-1/ Mary Baumgartner. W-1/
Baidiango then observed S-1/ Christine Gralow completely remove the nasal
cannula (Oxygen Tube) from V-1/ Mary Baumgartner's nose / nostrils. W-1/
Baidiango then heard S-1/ Christine Gralow say, "You need to be with your
husband", while still holding / showing her the photograph and looking directly
at V-1/ Mary Baumgartner.  Believing that S-1/ Christine Gralow was attempting
to deprive V-1/ Mary Baumgartner of oxygen for the purpose of ending her life,
W-1/ Baidiango yelled to S-1/ Christine Gralow and told her to resecure V-1/
Mary Baumgartner's oxygen tube, to which she eventually did. W-1/ Baidiango said
the  approximate time that S-1/ Christine Gralow deprived V-1/ Mary Baumgartner
of her required oxygen was approximately one (1) minute and thirty (30) seconds.

W-1/ Baidiango said she then walked through an adjacent room, so that she could
enter the master bedroom through a separate doorway. As she did so, she was
unable to see into the master bedroom or observe S-1/ Christine Gralow actions
for several seconds. As W-1/ Baidiango re-entered the master bedroom, she
observed S-1/ Christine Gralow completely remove the nasal Cannula (Oxygen
Tube) from V-1/ Mary Baumgartner's nose / nostrils for a second time while still
holding / showing V-1/ Mary Baumgartner the photograph of her deceased husband
and looking directly at V-1/ Mary Baumgartner. Again, believing that S-1/
Christine Gralow was attempting to deprive V-1/ Mary Baumgartner of oxygen for
the purpose of ending her life, W-1/ Baidiango yelled to S-1/ Christine Gralow
and told her to resecure V-1/ Mary Baumgartner's oxygen tube, to which she did.
W-1/ Baidiango said the second time S-1/ Christine Gralow deprived V-1/ Mary
Baumgartner of her required oxygen was approximately ten (10) to twenty (20)
seconds. It should be noted that W-1/ Baidiango was located approximately twenty
(20) feet away from S-1/ Christine Gralow when she observed her remove the
oxygen tube for the second time.

After resecuring V-1/ Mary Baumgartner's oxygen tube, S-1/ Christine Gralow
left the downstairs master bedroom, walked upstairs, and a short time later she
exited the residence via the front door.

During this time, W-1/ Baidiango contacted RP/Baumgartner via telephone and
advised her that her assistance was immediately required. A short time later,
RP/Baumgartner arrived at the residence and after learning what had been
witnessed she contacted the PVEPD for assistance.

W-1/ Baidiango believed that S-1/ Christine Gralow's intent was to deprive V-1/
Mary Baumgartner of her oxygen for the purpose of ending her life. W-1/
Baidiango also believed that if she had not witnessed the above events and
had not ordered S-1/ Christine Gralow to resecure V-1/ Mary Baumgartner's

oxygen supply she would have been successful in her intent to end V-1/ Mary
Baumgartner's life.

After I obtained the above statement, I entered the downstairs master bedroom
where the above incidents took place. I observed V-1/ Mary Baumgartner lying
in a hospital bed, on her back, in the Semi Fowler's position (head of the bed
raised 30-45 degrees). I observed a Respironics EverFlo Blue 5 Liter Home Oxygen
Concentrator unit on the floor, near the foot of her hospital bed. This device
consists of a compressor, sieve bed filter, oxygen tank, pressure valve, and a
nasal cannula, which is how V-1/ Mary Baumgartner receives her required oxygen
via her nostrils (see photographs). V-1/ Mary Baumgartner was unable to speak
or communicate; therefore, I was unable to obtain her statement involving this
incident.

I then walked outside and recontacted S-1/ Christine Gralow, who was sitting on
the curb in front of the residence. When asked, S-1/ Christine Gralow did not
admit that she had caused harm or attempted to cause harm to V-1/ Mary
Baumgartner.  S-1/ Christine Gralow said she was talking with V-1/ Mary
Baumgartner peacefully and that is when V-1/ Mary Baumgartner communicated with
her and said  she "is ready to go." When asked if she touched, removed, or
manipulated any of V-1/ Mary Baumgartner's medical equipment, S-1/ Christine
Gralow told me she did not.

Based on the above, I formed the opinion that S-1/ Christine Gralow entered the
residence of 1501 Via Asturias with the intent of taking her Aunt's (V-1/ Mary
Baumgartner) life. S-1/ Christine Gralow had knowledge of her Aunt's age and
that V-1/ Mary Baumgartner's survival was dependant on the constant use of
artificial oxygen, twenty-four hours a day. When S-1/ Christine Gralow told her
mother to remain upstairs and to not enter her sister's (V-1/ Mary Baumgartner)
bedroom, shows that S-1/ Christine Gralow's intent was to end her Aunt's life.
S-1/ Christine Gralow then willfully and intentionally removed the oxygen supply
to V-1/ Mary Baumgartner, which would have ended her life if it had not been
witnessed and stopped. Therefore, I placed S-1/ Christine Gralow under arrest
for 664(a) / 187(a) PC and 368(b)(1) PC.

I was later informed that RP/Baumgartner has Power of Attorney for V-1/ Mary
Baumgartner and  she handles all the financial and medical issues
pertaining to V-1/ Mary Baumgartner. I was also provided with the name and
contact number for V-1/ Mary Baumgartner's doctor if there were to be any
additional medical related questions:

Primary Care Physician:
Nancy Griffith MD
3701 Skypark Drive, Suite 150
Torrance, CA 90505
Office (310) 373-5566
Cell (310) 738-1020

Ziba Hospice:
3950 Paramount Blvd, Ste 101
Lakewood, CA 90712
(310) 328-4865
Jovanne - RN case manager
(310) 435-8608


I transported S-1/ Christine Gralow to the PVEPD jail for booking/processing on
her listed charges. Upon our arrival, I contacted and spoke with Honorable Judge

Chris Estes, who granted an Emergency Protective Order (T22008057) (EPO) for V-1/ Mary Baumgartner and is valid through 09-02-2022. I then provided a copy to S-1, who was inside the jail runway.

After S-1 had been booked/processed and was inside the female cell, Service Officer Lau (SO#39) advised me at 0220 hours that S-1 stated she had just had a seizure. Based on the above, Los Angeles County Fire Department - Station #2 responded and advised S-1 to be transported to Harbor General Hospital (HGH) - UCLA for further medical evaluation. Once at HGH, doctors announced S-1 she was cleared and could remain in jail and did not need any additional medical treatment.

We then transported her back to the PVEPD jail, where Sergeant Venegas (#733) and Officer Sisson (#761) transported S-1 to the Central Regional Detention Facility (CRDF).

On Saturday, 08-27-2022, I was advised that Sergeant Detective Gaunt (#722) called and was granted an EPO for the other family members that were at the above location during the incident. Sergeant Detective Gaunt also contacted Adult Protective Services (APS) and advised them of the incident (See attached supplemental for further).

See Booking number #22-00113 for further.

_____

**Responsible LEO:**

_____

**Approved by:**

_____

**Date**

04/25/23

## Supplement

Palos Verdes Estates Police Department
Supplemental Narrative

On Saturday, 08/27/2022, I (Gaunt / #722) assisted Officer Zabukovec #762, and Officer Ix #749, in the documentation of this 664 PC (Attempt) / 187 PC (Murder) report.

At approximately 0810 hours, I contacted the Los Angeles County Emergency Protective Order Hotline via telephone (213-738-2600). At that time, I spoke with the Honorable Judge Pratt, and relayed the circumstances surrounding this case; at which time she granted this EPO (See attached for further information).

Later that morning, Service Officer Placek #SO31 completed and submitted EPO-001 / T22008062 information into the JDIC Restraining Order System.

It should be noted PVEPD Officers transported S-1/Gralow to CDRF at approximately 0637 hours. Therefore, PVEPD Officers were unable to serve S-1/Gralow with this EPO prior to transport. Service Officer Placek contacted CDRF via telephone (323-568-4510) and requested that S-1/Gralow be served with the EPO. Deputy Rivas(NFD) informed SO Placek, CDRF Staff would not be able to serve S-1/Gralow and suggested S-1/Gralow be served on her court date; Tuesday, 08/30/2022, at Los Angeles Superior Court (Torrance Branch).

I contacted Adult Protective Services (APS) via telephone (877-477-3646) to report the incident involving both Mary Baumgartner (DOB: 12/06/1932), and Ruth Gralow (DOB: 04/21/1936). I spoke with Intake Reporter Justin #7039566, and relayed the circumstances surrounding this case. After relaying the circumstances, Justin provided me with APS Intake Numbers: 783586 (Baumgartner) / 783588 (Gralow), for both involved parties.

Later that morning, Officer Gavryush #755 responded to 1505 Via Asturias. At approximately 0946 hours, he contacted and provided the Baumgartner residents with a copy of the original EPO.

## Supplement

Palos Verdes Estates Police Department
Supplemental Narrative

On 08/29/2022, I (Detective Crisfield / 745) was assigned to further investigate this case.

I contacted the involved witness, Ellyzaellastelle Baidiango, via telephone who told me the following: Baidiango is a caregiver (approximately 5 weeks) of Mary Baumgartner (patient), who suffers from advanced Dementia, and suffered a stroke approximately two months ago that has left her bedridden. Since the stroke, Mary has used supplemental oxygen, which is required 24 hours a day.

On 08/26/2022, she was at Mary's residence (1501 Via Asturias) providing her hospice care. At approximately 1830 hours, Ruth Gralow arrived at the residence to visit with her sister, Mary. As Baidiango and Ruth spoke, Ruth exited the front door and stated she needed to look for her daughter, Christine Gralow. Shortly after, Baidiango heard a loud knock at the front door. AS she opened the front door, Christine walked passed her into the residence smelling of alcohol, and was followed by Ruth.

Baidiango returned to be with Mary, while Ruth and Christine remained on the second floor of the residence. While downstairs with M. Baumgartner, Baidiango heard Ruth and Christine arguing and then an unknown loud bang coming from the area of the home she believed them to be. As Baidiango ascended the home's staircase, Christine descended the stair case and passed her. Being concerned for R. Gralow's safety, Baidiango continued up the staircase and checked on Ruth, who was okay. While upstairs, Baidiango heard Christine yell up the stairway for Ruth not to come downstairs.

Baidiango began to walk back to Mary's room and as she reached the hallway she had a clear view of Christine standing beside the bed of Mary. At that time, she observed Christine holding the nasal oxygen tube in her hand that Mary had previously had in her nostrils. While holding the tube, she heard Christine tell Mary, she needed to be with her husband, who is deceased. Baidiango then instructed Christine multiple times to return the nasal tube to Mary's nostrils to which she eventually complied. Baidiango estimated approximately one minute and 30 seconds elapsed from the time she initially observed Christine holding the oxygen tube to when it was returned into Mary's nostrils.

Baidiango stated she walked through an adjacent room, through a bathroom, and into the opposite side of Mary's room from where Christine was standing. Baidiango stated she did this, because she was fearful of Christine's mental state and did not want to walk directly past her. As Baidiango entered the room, she observed Christine completely remove the nasal oxygen tubes from Mary's nostrils. Baidiango again instructed Christine to reinsert the nasal oxygen tubes or she would call the police and Christine complied.

Baidiango then contacted Mary's daughter, Debra Baumgartner, who responded to the residence and contacted the police.

During the incident, Baidiango discreetly recorded two separate conversations she explained occurred after the incident that she later provided to me. I listened to the two recordings and determined the only information of relevance is what I believe to be an unknown male accusing Christine of removing Mary's breathing apparatus and asked if she "put it back in". Christine responds by

stating "no one took anything out." Baidiango explained this recording occurred while Christine was sitting on the floor of Mary's room and Debra and her male acquaintance returned to the residence.

I then contacted Debra via telephone and she told me the following: Her Mother Mary is prescribed oxygen and spends 24 hours a day on an oxygen machine. The only time she does not have supplemental oxygen is when she is being moved from her bed into a chair and this is only momentarily.

I then contacted Mary's primary care physician, Nancy Griffith, via telephone, and she told me the following: Griffith confirmed Mary's suffers from advanced Dementia and experienced symptoms consistent with a stroke approximately 2 months ago that had left her bedridden. Due to her difficulty breathing, Mary is instructed by her doctor to use an oxygen breathing apparatus. Griffith stated that removing the oxygen tubes from her nose would not necessarily kill her but it would increase the difficulty of her breathing on her own.

Based on the above, this case will be forwarded to the Torrance District Attorney's office for filing considerations.

04/25/23

## Name Involvements:

**Offender :** ███

| | | |
|---|---|---|
| **Last:** GRALOW | **First:** CHRISTINE | **Mid:** MARY |
| **DOB:** 01/21/74 | **Dr Lic:** H01647894 | **Address:** 111 HEKILI ST. STE A-300 |
| **Race:** W    **Sex:** F | **Phone:** ( ) - | **City:** KAILUA, HI 96734 |

04/25/23